## Case No. 16,986.

In re VOGLER.

[2 Hughes, 297; [1] 8 N. B. R. 132.]

District Court, W. D. North Carolina. Feb., 1873.

BANKRUPTCY — HOMESTEAD EXEMPTIONS — STATE LAWS—CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS.

1. The act of congress of June 8th, 1872 [17 Stat. 334], giving to bankrupts the same exemptions as are allowed by the laws of the state in which they reside, so construed in connection with the laws of North Carolina on the subject, as that, in accordance with the decision of the supreme court of North Carolina, pronounced in the case of Hill v. Kesler, 63 N. C. 437, it was held, that the provisions of the state constitution, giving a homestead and other exemptions, apply to contracts existing before the adoption of the said constitution, as well as those made afterwards, and do not thereby violate the constitution of the United States prohibiting states from

2 [From 3 Pittsb. R. 268.]
1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

passing laws violating the obligation of contracts.

[Cited in Re McKenna, 9 Fed. 36.]

[2. Cited in Re Hall, Case No. 5,921, to the point that where homesteads have been duly allotted under the state law, and there is no fraud, such allotment will be recognized and allowed to bankrupts, under the bankrupt act.]

In bankruptcy.

[I, the undersigned register in bankruptcy, certify that the following questions arose, and were agreed to by Wm. S. Ball, Esq., attorney for Elias A. Vogler, and Thomas J. Wilson, attorney for Henry W. Fries, Esq., assignee of the estate of said bankrupt: First. Is the homestead and personal property exemption, provided for in article 10 of the constitution of North Carolina, to be regarded by the assignee as retroactive in its effect when he sets apart exempt property to a bankrupt, in this district? Second. Is the said E. A. Vogler entitled, in bankruptcy, to the real and personal property exemptions provided in article 10 of the constitution of North Carolina, or its equivalent in money derived from the sale of the said real and personal property, the same having been sold, and the proceeds of the sale thereof being now in the hands of the assignee?] [2] The petition herein was filed on the 13th day of May, 1871. Adjudication followed, and Henry W. Fries was appointed assignee, August 8th, 1871. Within twenty days thereafter he allotted to the bankrupt the property exempt under the then existing provisions of the bankrupt act of March 2d, 1867 [14 Stat. 517]. On the 30th of September, 1871, the said assignee filed a petition, praying for an order to sell the real estate of the said E. A. Vogler free from all incumbrances, and that the liens, if any, upon said property be transferred from said real estate to the funds in the hands of the assignee derived from such sale. The lands were, on the same day, directed by the court to be sold, and the proceeds thereof held as prayed for by assignee. The said lands were sold as ordered by the court, in the month of October, 1871, and there was received therefor, and is now in the hands of the assignee, an amount of money exceeding $1,000, the proceeds of said sale. There is also in the hands of said assignee an amount of money exceeding $500, the proceeds of the sale of personal property belonging to said E. A. Vogler. On the 8th day of June, A. D. 1872, there was approved an amendment to the 14th section of the bankrupt act of March 2d, 1867, by which a petitioner in bankruptcy is granted, in addition to the other exemptions enumerated in the said section, "such other property * * * as is exempted from levy and sale upon execution or other process or order of any court by the laws of the state in which the bankrupt had his domicil at the time of the commencement of the proceedings in bankruptcy, to an amount not exceeding that allowed by the exemption laws of such state in force in the year eighteen hundred and seventy-one." On the 31st day of Decem-

ber, 1872, the said Elias A. Vogler filed his petition asking for an order directing the said assignee to pay to him out of said moneys derived from the sale of his lands as aforesaid, $1,000, in lieu of the homestead, and $500, derived from the sale of his personal property as aforesaid, in lieu of the personal property exemption, provided in article 10 of the constitution of North Carolina, to which he says he is entitled under the said act of June 8th, 1872, amendatory of section 14 of the bankrupt act of March 2d, 1867.

Thomas B. Keogh, Register.

W. S. Ball, for bankrupt.
J. Wilson, for assignee.

DICK, District Judge. The laws in relation to homestead rights are of recent origin, and have given rise to frequent legislative and forensic discussions, and many conflicting judicial decisions. Time and much consideration will yet be required before the numerous questions arising out of the various statutes on this subject can be justly and satisfactorily settled by uniform legislation and adjudication in the several states. A humane and enlightened public sentiment gave rise to these various statutes, and they were intended not only for individual benefit but to secure an important public advantage. At the common law the lands and person of a debtor were exempt from execution for debts, as the principles of the feudal system upon which the government of England was founded required the lands and person of a tenant to be used for the security, power, and advancement of the kingdom. At a later period the demands and interests of an increasing commerce induced the parliament to pass various statutes de mercatoribus, by which the person and all the property of a trader might be taken in execution for a debt duly acknowledged. A subsequent statute gave to creditors the process of capias ad satisfaciendum against all debtors. The statute of elegit, however, only allowed the goods and chattels (excepting oxen and beasts of the plough), and a moiety of the lands of a debtor, to be taken and held until the debt was satisfied. Thus a homestead of a moiety of the lands and an exemption of beasts of the plough were at that early age of civilization allowed to debtors, and this continued to be the law of England until the statute 1 and 2 Victoria extended the elegit to all the lands of a debtor. Until within a recent period the statute law of this state subjected to execution the lands, person, and chattels of a debtor, and only a few articles of small value were allowed as exemptions to keep the debtor and his family from absolute starvation or dependence upon the charity of neighbors. This legislation and the natural greed of creditors necessarily had the effect of filling the country with families of paupers who were a burden instead of a benefit to the state. The constitution of this state, adopted in 1868, was the commencement of a new, more humane, and enlightened policy upon this subject. The results of the Rebellion had rendered a large

---

[2] [From 8 N. B. R. 132.]

number of our people bankrupt in fortune; and the convention of 1868 determined to insert a provision in our organic law, to preserve the liberty of an honest and unfortunate debtor, and secure a home for his family, and thus induce him to remain in our midst, and encourage and enable him by honest industry to assist in restoring wealth and prosperity to the state. Our feudal ancestors regarded the home and person of the citizen as belonging to the state, and necessary to its security, prosperity, and power. In allowing the homestead, and abolishing imprisonment for debt, except for fraud, the convention of 1868 adopted the same wise policy, but for a far higher object; not for the purpose of making the citizen a ready and efficient soldier in war, but to encourage and enable him to direct his intellect and energies in the arts of peace and the pursuits of industry, and thus contribute to national wealth, prosperity, and advancement.

It is a well-settled rule in the construction of constitutions and statutes, that the intent of the lawmaker ought to be ascertained from the circumstances of the times. and the purposes and remedies in view, and that the judicial department of the government ought to assist, as far as is consistent with a liberal construction of the organic law, in securing and advancing the purposes and remedies intended pro bono publico. The supreme court of North Carolina, in the case of Hill v. Kesler, 63 N. C. 437, has decided, "The provisions of the state constitution giving a homestead and other exemptions apply to pre-existing contracts, as well as to such as were entered into afterwards, and do not thereby violate the provision of the constitution of the United States in regard to the obligation of contracts." So far as this decision construes the meaning of the language of the constitution of the state the federal courts in this state ought to be governed by it as authority under the 34th section of the judiciary act of 1789 [1 Stat. 92]; but upon the question whether this homestead provision is in conflict with the constitution of the United States, as impairing the obligation of contracts, I have the right of forming my own opinions from the reasons, analogies, and authorities of the law. I was upon the supreme court bench, and concurred in the decision of Hill v. Kesler. I think it is well sustained by reason and high legal authorities, and I shall be governed by it in administering the law in this court unless it is overruled by some other federal court of superior jurisdiction. Where homesteads have been duly allotted under the state law and there is no fraud, such allotments will be recognized and allowed to bankrupts as proper exemptions under the bankrupt act. Where an allotment has not been made previous to the commencement of proceedings in bankruptcy, the homestead will be ascertained and set apart by the assignee under the directions of this court.

I will now proceed to inquire more fully as to the effect of the act of congress, of June 8th, 1872, amending the bankrupt law by including state exemption laws in force in the year 1871.

Congress has the power, under the constitution, to pass bankrupt laws and make all provisions which it may regard as necessary to carry out a system of bankruptcy. The purpose of a bankrupt system is to administer the estate of an insolvent person so as to do justice among all creditors by an equitable division of the assets; and then discharge the existing debts of a bankrupt, who in all respects has acted fairly and honestly in surrendering his property. This system is certainly founded in a wise and enlightened policy, as it frees an honest and unfortunate debtor from unexpected financial embarrassments which repress his energies, and from which he cannot extricate himself by reasonable exertions; and enables him to enter again into active business with new spirit and much wisdom learned from the experience of misfortune. He may thus become a good and useful citizen, and a character for honesty, industry, and intelligence will soon give him again employment and credit. If an insolvent person makes an honest surrender of all his property to his creditors, their debts in natural justice ought to be discharged, as they have no moral right to make the debtor a slave and demand the proceeds of his manual or intellectual labor, prevent him from educating and comfortably supporting his dependent family, and thus cause a serious injury to the state. These liberal and humane views as to the relations between creditors and honest insolvent debtors have, in the last twenty years, rapidly impressed themselves upon public sentiment, and form a striking feature in the enlightened and patriotic homestead legislation of a large number of the states of the American Union.

The several states have heretofore adopted systems of insolvent laws, but could not free the debtor from pre-existing debts, as they were prohibited by the constitution of the United States from making laws impairing the obligation of contracts. Now that imprisonment for debt, except for fraud, has been abolished by the organic law of most of the states, state insolvent laws furnish but little relief, as they strip a debtor of his property, leave upon him the burden of his debts, and thus continue him in a condition of poverty, inefficiency, and financial servitude. The very essence of a national bankrupt system, is the doing away with pre-existing contracts, the prevention of preferences among creditors allowed by the common law, the distribution of the assets of a debtor upon the principle that equality is equity among creditors, and the making of such reasonable exemptions of property to the bankrupt as will keep him from absolute poverty, give him some means to commence life anew, support and educate his family, and make him a good and useful citizen. Upon this subject there is no constitutional inhibition imposed upon congress, and it can exercise the full powers of sovereignty, and is only restrained by the broad principles of justice and enlightened statesmanship and the responsibility felt by its members to their constituents.

Among the exemptions made in the bankrupt act of March 2d, 1867, it was provided that such property should be retained by a bankrupt as was allowed in his state by exemption laws in force in the year eighteen hundred and sixty-four. Before that period a number of states had provided liberal homesteads for their citizens whch were recognized and allowed in the courts of bankruptcy. The individual insolvency and necessities of a large number of citizens, caused by the misfortunes of the Rebellion, induced other states after the war to adopt homestead and exemption laws to protect many of their people from absolute financial ruin. Such laws would not afford the remedies demanded by the emergencies of the situation unless the homestead was secured against pre-existing debts, and a provision for that purpose was generally inserted in the laws upon that subject. This retroactive feature of such laws gave rise to much discussion in the courts, and some conflicts of judicial decision. To render the bankrupt law more just and uniform by giving the benefit of homestead exemptions to the citizens of the states which had passed such l: /s subsequent to the year 1864, to do away with constitutional objections and settle conflicting judicial decisions on the subject, congress interposed its sovereign power and gave effect to state laws upon the question by adopting the amendatory statute of June 8th, 1872. Congress would have had no other object in view in making such amendment than to include homestead exemptions made in the several states subsequent to the year 1864. The intent of congress is manifest, and its sovereign power over the subject is settled by numerous adjudications; and we think that we are justified in giving this remedial statute the widest latitude of construction which may be necessary to carry out the supreme legislative will. The constitution of North Carolina provides for a homestead; the supreme court, in a case involving the question, have decided that such provisions apply to pre-existing as well as subsequent debts; the act of June 8th, 1872, makes such laws a part of the bankrupt law so far as the citizens of this state are concerned, and will be recognized and enforced in the bankrupt courts of this district.

I have read with much care and interest the able, learned, and elaborate opinion of Judge Rives, in Re Wyllie [Case No. 18,112], and regret that we have decided differently some of the same questions involved in our respective cases. It was contended in the argument that independent of the act of June 8th, 1872, the homestead exemption in this state might be allowed under the clause in the bankrupt law which provides. "and such other property as now is, or hereafter shall be, exempted from attachment, or seizure, or levy on execution, by the laws of the United States." The homestead under our state laws is exempted from levy and sale under execution. The act of congress of May 19th, 1828 [4 Stat. 278], provides that execution or other final process in the federal courts shall be the same as in the state courts, etc. This act applies to state laws in force at the date of said act, and at that time the homestead was not exempt from the executions of state courts. The same act provides that the federal courts, by rule of court, may make their final process conform to any changes afterwards made as to final process in the state courts. No rule upon this subject, that I am aware of, has been adopted by the federal courts of this state, since the adoption of the homestead provision in the state constitution; and I have been informed that homesteads have been sold under executions issuing from the circuit court of the district of North Carolina. I hold, therefore, that the homestead of the bankrupt in this case was not exempt under the clause of the bankrupt law above referred to, by virtue of the act of May 19th, 1828, as no rule to that effect has been adopted by the federal courts of this state.

The second issue certified to this court by the register presents a question of law which has been decided by Judge Rives in Re Wyllie, supra, and to that extent I concur in that decision. The real estate in our case was directed, by an order of the court, to be sold, "free from all incumbrance, and that the liens, if any, upon said property be transferred from said real estate to the funds in the hands of the assignee, derived from such sale." This sale did not convert the real estate out and out into personalty, and the proceeds of sale are to be regarded by the court as realty in adjusting liens and limitations upon the fund. The bankrupt act as amended June 8th, 1872, expressly provides that exemptions under state laws in force in the year 1871 "shall operate as a limitation upon the conveyance of the property of the bankrupt to his assignees, and in no case shall the property hereby exempted pass to the assignees, or the title of the bankrupt thereto be impaired or affected by any of the provisions of this act." The technical meaning of the word limitation, when applied to conveyances of property, is a qualification or restriction upon the estate conveyed. When there is an adjudication of bankruptcy the law takes the property of the bankrupt and conveys it to the assignee as a trustee, to be held and disposed of in such manner as will effect the objects of the statute. This trust estate of the assignee operates by way of relation back to the commencement of the proceedings in bankruptcy. The property remains in custodia legis until the rights of the bankrupt and of the creditors who prove their debts, and of creditors who hold any kind of lien, are all ascertained and adjusted. Where a debt is proved and allowed, the creditor is entitled to claim a share of the assets when a dividend is declared, but he has no vested interest in the property until such interest is designated and declared by the court. As no distribution has been ordered in this case, or absolute vested rights disturbed, and considering the evident intent of congress in passing the remedial statute of June 8th, 1872, we see no reason why this limitation in favor of the bankrupt may

not be extended by relation back to the commencement of the estate of the assignee, and exempt a homestead out of the fund which is still realty in contemplation of law.

The act of June 8th, 1872, as we have before remarked, is a highly remedial statute, and the remedy contemplated was to make just and uniform exemptions to all bankrupts, by allowing homesteads and exemptions provided by the state laws subsequent to the year 1864; and it would require a very strict construction of the statute to exclude from the intended remedy bankrupts whose petitions were filed before the passage of the statute, whose estates are undisturbed and under the control of a court, which, on this subject, can exercise the extensive, liberal, and beneficent jurisdiction of a court of chancery. It is a rule of construction universally agreed to, that a remedial statute is to be liberally construed, and that everthing is to be done in advancement of the remedy that can be given, consistently with any reasonable construction which can be put upon it. Potter, Dwar. 73. We admit that the general rule that no statute is to have a retrospect beyond the time of its commencement is well established both in English and American jurisprudence. "But this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do not impair contracts or disturb absolute vested rights already existing; and in furtherance of the remedy, by curing defects and adding to the means of enforcing existing obligations. Such statutes have been held valid when clearly just and reasonable, and conducive to the general welfare." Id. 164, note. This rule as to the construction of remedial statutes somewhat confines the powers of legislative bodies which are controlled by constitutional restrictions. In the case of lawmakers who can exercise the full powers of sovereignty (as the parliament, and congress on the subject of bankruptcy) this elementary rule is one of construction only, and must always yield when necessary to carry out the manifest purposes of the supreme legislative will. Even if we were of the opinion in this case that all the property of the bankrupt passed to the assignee which was not exempted, by the act before the amendment of June 8th, 1872, we would still be inclined to hold that this court had such control of the assets before distribution was made as would authorize us to allow the bankrupt the benefit of such amendatory statute. The assignee is an officer of the court and the title of the property is conveyed to him by the court for the more convenient collection and distribution of the assets according to the purposes and provisions of the statute. The assignee has no individual interest in the property, and his title in no way affects the equitable rights of other persons; but he holds as a custodian of the law, until the court ascertains the legal and equitable rights of persons interested in the assets and orders a distribution to be made. Until such time, creditors proving debts have no ab-

solute vested rights, and the court, after adjusting liens, may make a disposition of the assets, according to the rights of parties, under laws existing at the time distribution is ordered.

The proceedings in bankruptcy in this case were commenced in the year 1871, and at that time the bankrupt was entitled by the laws in force in this state to have exempted from execution or other final process a homestead not exceeding in value one thousand dollars and personal property to the amount of five hundred dollars. As the real and personal estate have been sold since that time under the order of this court above referred to, we are of the opinion that the bankrupt is entitled to an amount of money out of the proceeds of such sale, now under the control of this court, equal to the value of such homestead and personal property exemption, to be held according to his rights under the state laws. It is therefore ordered by the court that Henry W. Fries, Esq., assignee, deliver to the clerk of this court the sum of one thousand dollars out of the proceeds arising from the sale of the lands of E. A. Vogler, bankrupt, to be held by said clerk until the rights of creditors in the reversion of the homestead and the liens of judgment creditors can be ascertained and adjusted, and quitclaim deeds executed by said E. A. Vogler to the purchasers of said real estate. It is further ordered that Henry W. Fries, assignee, pay over to E. A. Vogler, bankrupt, the sum of five hundred dollars arising from the sale of his personal property, in lieu of the personal exemption allowed by the laws of this state. It is further ordered that Thomas B. Keogh, Esq., one of the registers of this court, proceed to ascertain and report the value of the reversion of said homestead estate, and the number and amount and nature of the judgment liens that exist against said estate, and prepare proper quitclaim deeds to be executed by the said E. A. Vogler to the purchaser of the lands sold by the said assignee.